# 12-2414-cv

## United States Court of Appeals

*for the*

## Second Circuit

ONY, INC.,

*Plaintiff-Appellant,*

– v. –

CORNERSTONE THERAPEUTICS, INC., CHIESI FARMACEUTICI S.p.A.,
NATURE AMERICA, INC. DBA Nature Publishing Group, EDWARD E.
LAWSON, M.D., AMERICAN ACADEMY OF PEDIATRICS, PREMIER,
INC., DBA Premier Research Services, RANGASAMY RAMANATHAN, M.D.,
JATINDER J. BHATIA, M.D., KRISHNAMURTHY C. SEKAR, M.D.,
FRANK R. ERNST, PHARM. D.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

JAECKLE FLEISCHMANN & MUGEL, LLP
*Attorneys for Plaintiff-Appellant*
Avant Building - Suite 900
200 Delaware Avenue
Buffalo, New York 14202
(716) 856-0600

## CORPORATE DISCLOSURE STATEMENT

ONY, Inc. is a privately-held corporation.  No publicly-held entity owns

10% or more of the stock of ONY, Inc.

## **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT .......................................................... i

TABLE OF CASES AND AUTHORITIES ............................................................. vi

JURISDICTIONAL STATEMENT ........................................................................1

ISSUES PRESENTED FOR REVIEW ..................................................................1

STATEMENT OF THE CASE..............................................................................3

    A.    Nature of the Case ...........................................................................3

    B.    Course of Proceedings and Disposition Below....................................3

STATEMENT OF FACTS ....................................................................................4

SUMMARY OF ARGUMENT ............................................................................14

ARGUMENT .....................................................................................................18

    I.    THE DISTRICT COURT ERRED IN DISMISSING
        ONY'S CAUSES OF ACTIONS UNDER THE
        LANHAM ACT, GBL §349, AND THE TORT OF
        INJURIOUS FALSEHOOD ON THE GROUNDS
        THAT THE ARTICLE IS A NON-ACTIONABLE
        STATEMENT OF OPINION..............................................................18

        A.    The District Court's Determination That the Article
            Is Non-Actionable Opinion Was Premature ...........................19

        B.    The Article Does Not Constitute Non-Actionable
            Statements of Opinion..............................................................20

            1.    The Language of the Article Has a Precise
                Meaning Which Is Readily Understood ........................22

            2.    The Statements Are Capable of Being
                Proven True or False.....................................................22

3. The Context of the Statements Indicate They Are Presented as Fact, Not Opinion ..............................23

C. ONY Has Sufficiently Pleaded a Claim Under the Lanham Act As the Article Is Actionable Commercial Speech ................................................................26

1. Plaintiff Has Sufficiently Pleaded a Claim for a Violation of the Lanham Act Based on the Article Itself ............................................................28

a) The Article Constitutes Speech Used in Commercial Advertising or Promotion ............................................................28

(1) The Article Meets the Commercial Speech Prong of the Standard Articulated in *Fashion Boutique* and Its Progeny ..........................29

(a) The Article Is Commercial Speech ..............................................30

(2) The Article Also Meets the Second and Third Prongs of the *Fashion Boutique* Standard ......................35

D. ONY Has Sufficiently Pleaded a Claim Under GBL §349 in Connection With the Article's Initial Publication ................................................................36

E. ONY Has Sufficiently Pleaded a Claim for the Tort of Injurious Falsehood in Connection With the Article's Initial Publication ................................................37

II. THE DISTRICT COURT ERRED IN DISMISSING ONY'S CAUSES OF ACTIONS UNDER THE LANHAM ACT, GBL §349 AND INJURIOUS FALSEHOOD RELATED TO THE SECONDARY DISSEMINATION OF THE ARTICLE ................................................38

A. ONY Sufficiently Pleaded a Claim Under the
Lanham Act Related to the Secondary
Dissemination of the Article ........................................39

B. ONY Sufficiently Pleaded a Claim Under GBL
§349 and For Injurious Falsehood Related to the
Secondary Dissemination of the Article ..................................42

1. ONY Has Sufficiently Pleaded That the
Secondary Dissemination of the Article
Violates GBL §349 ........................................43

2. ONY Has Sufficiently Pleaded That the
Secondary Dissemination of the Article
Supports a Claim For Injurious Falsehood....................44

III. ONY'S COMPLAINT OR ITS PROPOSED AMENDED
COMPLAINT SUFFICIENTLY PLEADED MALICE
AND SPECIAL DAMAGES IN CONNECTION WITH
PLAINTIFF'S CLAIMS FOR INJURIOUS
FALSEHOOD ........................................44

A. Malice ........................................45

1. Pharmaceutical Defendants ........................................46

2. Defendant Authors........................................47

3. Premier........................................47

B. Special Damages ........................................48

IV. THE DISTRICT COURT ERRED IN DISMISSING
PLAINTIFF'S CLAIM FOR TORTIOUS
INTERFERENCE AS ONY HAS SUFFICIENTLY
PLEADED WRONGFUL MEANS ........................................50

V. THE DISTRICT COURT ABUSED ITS DISCRETION
IN REFUSING TO PERMIT ONY TO AMEND ITS
COMPLAINT, AS SUCH AN AMENDMENT WOULD
NOT HAVE BEEN FUTILE ........................................53

VI.    THE DISTRICT COURT ERRED AS A MATTER OF
LAW IN FINDING NO PERSONAL JURISDICTION
OVER THE DEFENDANT AUTHORS, AS THERE
WERE SUFFICIENT CONTACTS STEMMING FROM
THE PUBLICATION OF THE ARTICLE..........................................54

    A.    In Executing the License to Publish, the Individual
Defendants Consented to Personal Jurisdiction in
the State of New York.................................................................55

    B.    The Individual Defendants Had Sufficient
Contacts With New York Such That Personal
Jurisdiction Exists Under CPLR §302(a)(1)............................57

        1.    Defendant Authors Have Purposefully
Availed Themselves of the Privileges of
Transacting Business in New York ................................59

        2.    There Is a Substantial Connection Between
the Defendant Authors' Submission of the
Article and the Claims Asserted Against
Them ...............................................................................63

CONCLUSION.....................................................................................64

CERTIFICATE OF COMPLIANCE....................................................65

# TABLE OF CASES AND AUTHORITIES

**Page**

**Cases**

*Alianza Dominicana, Inc. v. Luna*, 229 A.D.2d 328 (1st Dept. 1996), *lv. to appeal dismissed*, 89 N.Y.2d 1029 (1997).................................................................................................46

*Azby Brokerage, Inc. v. Allstate Insurance Co.*, 681 F. Supp. 1084 (S.D.N.Y. 1988) ................................36

*Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757 (2d Cir. 1983)...................................................................................57

*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983)................................................................................ 29, 30, 32

*Boule v. Hutton,* 328 F.3d 84 (2d Cir. 2003) ..........................................28

*Brian v. Richardson*, 87 N.Y.2d 46 (1995)...........................................23

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)...................................58, 59

*Calder v. Jones*, 465 U.S. 783 (1984)..............................................61, 62

*Cantor Fitzgerald, L.P. v. Peaselee*, 88 F.3d 152 (2d Cir. 1996)..................................................................................57

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182 (2004) ...............................51, 52

*Carvel Corp. v. Noonan*, 350 F.3d 6 (2d Cir. 2003)............................51

*Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163 (2d Cir. 2000) ...........................................................................45

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980) (Blackmun, J., concurring) ....................................................27

*Charles Atlas, Ltd. v. Time-Life Books, Inc.*, 570 F. Supp.
150 (S.D.N.Y. 1983).................................................................. 45, 46

*Cromarty v. Prentice-Hall, Inc.*, 72 A.D.2d 782 (2d Dept.
1979).........................................................................................49

*D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95 (2d Cir.
2006)........................................................................................56

*Davidson Extrusions, Inc. v. Touche Ross & Co.*, 131
A.D.2d 421 (2d Dept. 1987)....................................................61

*DirecTV, Inc. v. Rowland*, 2005 U.S. Dist. LEXIS 2454
(W.D.N.Y. Jan. 22, 2005).........................................................36

*Drug Research Corp. v. Curtis Publishing Co.*, 7 N.Y.2d
435 (1960)............................................................................ 38, 49

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
314 F.3d 48 (2d Cir. 2002) ............................................ 28, 29, 35

*Fischbarg v. Doucet*, 9 N.Y.3d 375 (2007) .............................58

*Foman v. Davis*, 371 U.S. 178 (1962) ....................................53

*Global Gospel Music Group LLC v. Habukkuk Music,
Inc.*, 2010 WL 4968172 (S.D.N.Y. 2010) ............................61

*Gordon and Breach Science Publishers S.A., STBS., Ltd. v.
American Institute of Physics*, 859 F.Supp. 1521
(S.D.N.Y. 1994) ("*Gordon & Breach I*") .... 19, 31, 32, 33, 34, 39, 40, 41

*Gross v. New York Times Co.*, 82 N.Y.2d 146 (1993)............. 19, 20, 21, 22, 24, 25

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50
N.Y.2d 183 (1980)...................................................................52

*Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55 (2d
Cir. 1985).................................................................................57

*Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235 (1991),
*cert. denied*, 500 U.S. 954 (1991) ...................................... 19, 23

*Kirby v. Wildenstein*, 784 F. Supp. 1112 (S.D.N.Y. 1992)......................48

*Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460 (1988)........................59

*Maranga v. Vira*, 386 F. Supp. 2d 299 (S.D.N.Y. 2005)........................61

*Mario Valente Collezioni, Ltd. v. Confezioni Semeraro
 Paolo, S.R.L.*, 264 F.3d 32 (2d Cir. 2001)..............................54

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)................. 15, 20, 25

*OPA (Overseas Publishing Association) Amsterdam BV v.
 American Institute of Physics*, 973 F.Supp. 414
 (S.D.N.Y. 1997)........................................................40

*Parsons v. Kal Kan Food, Inc.*, 68 A.D.3d 1501 (3d Dept.
 2009).................................................................61

*Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.*, 7
 A.D.2d 441 (1st Dept. 1959).........................................45

*Phillips v. Audio Active Limited*, 494 F.3d 378 (2d Cir.
 2007).................................................................56

*Porous Media Corp. v. Pall Corp.*, 1998 U.S. Dist. LEXIS
 23651 (D. Minn. June 3, 1998) .......................................19

*Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256
 (2d Cir. 1995), *cert. denied*, 516 U.S. 1114 (1996) .............. 36, 43, 44

*Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108 (6th Cir. 1995).......... 31, 32, 33

*Stapleton Studios, LLC v. City of New York*, 26 A.D.3d
 236 (1st Dept. 2006)................................................52

*The Royalty Network Inc. v. Dishant.com, LLC*, 638
 F. Supp. 2d 410 (S.D.N.Y. 2009) ....................................58

*Thomas v. Ashcroft*, 470 F.3d 491 (2d Cir. 2006) ................57

*Trump v. Chicago Tribune Co.*, 616 F. Supp. 1434
 (S.D.N.Y. 1985).....................................................18

*Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309
   F. Supp. 2d 401 (E.D.N.Y. 2004)........................................................49

**Statutes**

15 U.S.C. §1125 (Lanham Act) .................................................. passim

CPLR §301 .............................................................................. 57, 58, 61

CPLR §302 ..................................................................................... 57, 61

CPLR §302(a)(1) ..................................................................... 54, 57, 58

CPLR §302(a)(2) ...................................................................................57

CPLR §302(a)(3) ...................................................................................57

FRCP Rule 12(c) ...................................................................................19

New York General Business Law §349............................................ passim

New York General Business Law §349(h) ...........................................36

## JURISDICTIONAL STATEMENT

(A)    Plaintiff's complaint contained causes of action under both Federal and State law, including a claim under the Lanham Act.  As such, the District Court had jurisdiction pursuant to 28 U.S.C. §1331 and 15 U.S.C. §1121.

(B)    Plaintiff appeals from a final judgment of the United States District Court for the Western District of New York; as such, this Court has jurisdiction pursuant to 28 U.S.C. §1291.

(C)    The District Court filed its Decision and Order on May 18, 2012 (A-240 to A-264) with the resultant Judgment filed on May 21, 2012 (A-265).  On June 14, 2012, Plaintiff filed its Notice of Appeal with the District Court (A-266 to a-268).

(D)    Plaintiff's appeal is from a final judgment that dismissed all of Plaintiff's causes of actions against all Defendants.

## ISSUES PRESENTED FOR REVIEW

1.    Whether the District Court erred as a matter of law in dismissing Plaintiff's claims for false advertising under the Lanham Act, General Business Law §349 and the tort of injurious falsehood on the grounds that the Article which is the subject of plaintiff's claims contained non-actionable statements of opinion.

2. Whether the District Court erred as a matter of law in dismissing Plaintiff's claims for false advertising under the Lanham Act, General Business Law §349 and the tort of injurious falsehood related to the secondary dissemination of the Article.

3. Whether the Complaint, either as originally filed or as proposed to be amended, sufficiently pled malice in connection with Plaintiff's injurious falsehood claims.

4. Whether the Complaint, either as originally filed or as proposed to be amended, sufficiently pled special damages in connection with Plaintiff's injurious falsehood claims.

5. Whether the District Court abused its discretion in denying the Plaintiff's motion to amend its complaint even before Defendants had submitted answers on the grounds that any such amendment would be futile.

6. Whether the District Court erred as a matter of law in dismissing the action as against Defendants Ramanathan, Bhatia, Sekar, and Ernst for lack of personal jurisdiction.

## STATEMENT OF THE CASE

### A.    Nature of the Case

Plaintiff ONY, Inc. ("ONY") brought this action in the District Court alleging violations of the Lanham Act, New York State General Business Law ("GBL") §349, and the state torts of injurious falsehood and tortious interference with contract.  These claims stem from an article written, published, sanctioned and disseminated by the Defendants which, as alleged, contains false statements of fact regarding the efficacy of ONY's product.

### B.    Course of Proceedings and Disposition Below

On December 2, 2011, ONY filed its Complaint asserting various claims against each of the Defendants.  On December 8, 2011, ONY filed a motion for expedited discovery and for an expedited hearing thereon.  On January 17, 2012, all of the Defendants filed motions to dismiss the Complaint, as well as oppositions to ONY's motion for expedited discovery.  On January 30, 2012, ONY filed its reply in further support of its motion for expedited discovery.  On February 3, 2012, ONY filed its response to the Defendants' dismissal motions and cross-moved to amend the Complaint.  On February 13, 2012, Defendants filed their reply papers in support of their motions to dismiss; on February 24, 2012, Defendants filed their responses to ONY's motion to amend.  On March 2, 2012, ONY filed its reply on its motion to amend.

The District Court did not entertain oral argument (although requested by all parties) and on May 18, 2012 issued a Decision and Order granting Defendants' motions to dismiss, denying ONY's cross-motion to amend, and denying as moot ONY's motion for expedited discovery and Defendants Chiesi, Cornerstone, Bhatia, Sekar and Ramanathan's motions to strike an amended affidavit of ONY's principal, Dr. Edmund Egan, in support of ONY's motion to amend.

On June 14, 2012, ONY filed its Notice of Appeal. None of the Defendants have appealed from the denial of the motion to strike.[1]

## STATEMENT OF FACTS

On this appeal from Defendants' motions to dismiss, the Complaint's allegations of fact are taken as true. Those facts as therein alleged (except as noted) are as follows:[2]

Last year in the United States, approximately 12% of infants were born prematurely. A-16, ¶14. Of those premature infants, approximately 3.5% were born at 33 weeks or less and/or had extremely low birth weight. *Id.* One of the

---

[1] ONY and Defendants-Appellees Nature America, Inc. ("Nature"), Edward E. Lawson, M.D., and American Academy of Pediatrics ("AAP") have reached agreement in principle on a settlement which is expected to result in the withdrawal of this appeal as against them only. The arguments presented herein assume that a definitive settlement agreement will be finalized and executed. In the event it is not, ONY reserves the right to seek leave to file a supplemental brief which presents its arguments as to these defendants.
[2] Cites to the Joint Appendix are referred to herein as "A-_."

4

issues faced by such infants is incomplete or inadequate lung development. A-16, ¶15.

The human body naturally produces "surfactants" which line the surface of the lungs and are required for proper lung function. A-16, ¶16. In its simplest definition, a surfactant is a material which alters the surface tension of a surface or substrate, essentially rendering it "slimy" or "slippery" to the touch. *Id.*

In the lungs, the presence of surfactant provides two primary benefits. A-17, ¶17. First, the surfactant promotes the continuous exchange of oxygen and carbon dioxide. Second, the surfactant ensures that the millions of air sacs in the lungs inflate properly and evenly without overinflating. *Id.* If the surfactant level in the lungs is inadequate, death can ensue as a result of, among other things, the lungs irrevocably collapsing or inadequate oxygenation. *Id.* In the case of many infants born prematurely ("neonates"), the lungs have not produced enough surfactant for adequate lung performance. *Id.* As a result, neonates often exhibit Respiratory Distress Syndrome ("RDS"). *Id.* RDS causes respiratory difficulty which progresses to respiratory failure and death if not effectively treated. *Id.* To address RDS in infants, the predominant course of treatment is to administer a surfactant to supply sufficient lung surfactant until such time the neonate can produce its own. A-17, ¶18.

5

In the United States, the three FDA-approved surfactants to treat neonates are animal-derived. A-17, ¶19. The first is calfactant (Infasurf®), derived from bovine lung surfactant and manufactured by the Plaintiff. A-17, ¶20. The second is beractant (Survanta®), derived from bovine lung mince and manufactured by Abbott Pharmaceuticals. A-17, ¶21. The third is poractant alfa (Curosurf®), derived from porcine lung mince and manufactured by Defendant Chiesi Farmaceutici, S.p.A. ("Chiesi") and distributed and marketed in the United States by Defendant Cornerstone Therapeutics, Inc. ("Cornerstone") (collectively referred to as the "Pharmaceutical Defendants"). A-17, ¶22.

While each of the animal-derived surfactants has a different composition, they are all FDA approved for the treatment of RDS. A-18, ¶23. Additionally, Infasurf® and Survanta® are FDA approved for the prevention of RDS; Curosurf® is not. *Id.* There have been multiple clinical trials comparing these surfactants, yet in no completed trial has one surfactant been identified as being superior with respect to the outcome of death. A-18, ¶25.

Length of stay, or "LOS," data is a generally-accepted scientific measure, used as a means to correlate premature infant mortality with treatment. A-18, ¶26. For low-birth-weight premature infants, LOS data indicates whether the infants died or rather whether they survived the myriad problems of being born too early. *Id.* Thus, two groups of premature infants with similar objective characteristics

6

(birth weight, gestational period, etc.) with different mortality rates will have different lengths of stay. *Id.* The group with the lower mortality will have a longer LOS, because the majority of premature infants in the group will require prolonged hospitalization until they are physically big enough and mature enough to go home. *Id.* Conversely, the group of premature infants which exhibits a higher mortality will have a shorter LOS because the members of the group who died will require a shorter hospital stay than those who survived. *Id.* Stated simply, premature infant mortality and LOS are inversely related. *Id.*

As a result, when comparing the impact of surfactant products on mortality of premature infants, the reliability of mortality data depends on inclusion of LOS data. A-19, ¶27. Absent LOS data, false conclusions regarding mortality can be reached. *Id.*

In 2006, Defendant Chiesi conducted or commissioned a "study" to support the claim that Curosurf® was a superior surfactant. A-19, ¶28. In so doing, it engaged and paid Defendant Premier, Inc. ("Premier"), which in turn paid Defendant Ernst (a Premier employee) to provide a database to support the desired conclusion that Curosurf® was superior. *Id.*

Defendant Chiesi paid Defendants Ramanathan, Bhatia, Sekar and other authors to submit and present the "findings" of the Chiesi "study" to the Pediatric Academic Societies Annual Meeting in the United States on or about May 7, 2007.

7

A-19, ¶29.  The "findings" presented were that Curosurf®, Chiesi's product, resulted in 20% lower mortality than "babies treated with … either [Survanta®] or [Infasurf®]."  A-19, ¶30.

Defendant Chiesi paid Defendants Ramanathan, Bhatia, Sekar, Ernst and other authors to submit and present other "findings" of the Chiesi "study" to the European Pediatric Society Annual Meeting on or about October 7, 2007.  A-19, ¶31.  The findings presented in Europe were that Curosurf®, Chiesi's product, resulted in 15% shorter LOS than "babies treated with … either [Survanta®] or [Infasurf®]."  A-19, ¶32.

Both the May 2007 United States presentation and the October 2007 European presentation were based on the same data source and data.  A-19, ¶33. In connection with the May 2007 presentation in the United States, however, Defendants Ramanathan, Bhatia, and Sekar did not submit or present any of the available LOS data.  A-20, ¶33.  Similarly, in connection with the October 2007 presentation in Europe, Defendants Ramanathan, Bhatia, Sekar and Ernst did not submit or present any of the mortality data.  *Id.*  Essentially, in each presentation, these Defendants selectively, and intentionally, omitted half of the necessary information to make the data presented relevant and reliable, even though it was available to them and they in fact knew about it.  A-20-21, ¶33.

8

After the 2007 presentations, Defendants Ramanathan, Bhatia, Sekar and Ernst did not seek to have their "results" published in any national peer-reviewed journal. A-20, ¶34. In 2011, however, Defendants Ramanathan, Bhatia, Sekar and Ernst (each a "Defendant Author" and collectively the "Defendant Authors") submitted a revised study for publication utilizing the same data source and some of the same data from the 2007 presentations (the "Article") to the Journal of Perinatology (the "Journal"), the primary and preeminent publication for practitioners in the field of neonatal-perinatal medicine or neonatology. A-21, ¶¶35, 38, 39. The Article again made the false claim that preterm infants treated with Curosurf® have lower mortality than those treated with Infasurf®, including by the following statements:[3]

- "**Result**: Calfactant was associated with a 49.6% greater likelihood of death than poractant alfa";

- "**Conclusion**: Poractant alfa treatment for RDS was associated with a significantly reduced likelihood of death when compared with calfactant";

- "Calfactant was found to be associated with a 49.6% greater likelihood of death than poractant alfa";

- "This model found calfactant to be associated with a significantly greater likelihood of death than poractant alfa";

_____

[3] The contents of the Article were annexed to defendants-appellants' motions to dismiss (A-46 - A-52) and also quoted in plaintiff-appellant's Proposed Amended Complaint (A-205, ¶5).

9

- This study "show[ed] a significant greater likelihood of death with calfactant than poractant alfa"; and

- "[T]his large retrospective study of preterm infants with RDS found lower mortality among infants who received poractant alfa, compared with infants who received either calfactant or beractant, even after adjusting for patient characteristics such as gestational age and BW, and after accounting for hospital characteristics and center effects".

Other authors of the two 2007 presentations were omitted as authors of the Article by the Pharmaceutical Defendants, the sponsors of the study, in an effort to control and limit the extent of inquiry into the Article's bona fides. A-20, ¶36.

Notably, the data which served as the basis for the Article was not based upon an actual clinical study. A-20, ¶37. Rather, the data was culled from a database of information which Defendant Premier collected from various reporting hospitals and physicians. *Id.* As a result, the data was retrospective and was subject to selective distortion. A-21, ¶37. Specifically, the reliability of any reported mortality data is a function of the similarity of the characteristics of the group of infants examined, including the LOS data. *Id.* Deliberate omission of the LOS data allows the Defendants to postulate, promote and disseminate false conclusions regarding any differences in the mortality of infants treated with one product versus another. *Id.*

10

The Article suffered from the same defects as each of the separate presentations in 2007 by omitting key data (*i.e.*, LOS data) that is necessary for an accurate interpretation. A-21, ¶40. In 2011, just as in 2007, the Defendant Authors "cherry-picked" what information they would present. *Id.* The Defendant Authors had access to and were aware of the pertinent LOS data, yet chose to omit it from the Article. A-21, ¶41. The Pharmaceutical Defendants orchestrated the content of the Article, including inducing Defendants Premier and Ernst to supply only the data which would support the desired outcome (*i.e.*, lower mortality in neonates treated with Curosurf®). A-21, ¶42.

Chiesi's manipulation of data to support false and misleading findings is part of a pattern and practice. A-21, ¶43. In particular, in a 2004 article in the Journal sponsored by Chiesi and written by the same authors, they likewise "cherry picked" data to assert a false claim that Curosurf® was superior to Survanta® for mortality. A-22, ¶43.

In addition to failing to include the LOS data for the subject infants, the Defendant Authors, in deviation of the journalistic standards applicable to peer-reviewed articles, also omitted citation to at least one article which contradicted the findings in the article submitted for publication, even though such articles existed and were known to the Defendant Authors. A-22, ¶44.

11

Defendant Authors knew the content of the Article to be deficient, yet as paid consultants for Defendants Chiesi, Cornerstone and/or Premier, submitted the Article for publication nonetheless.  A-22, ¶45.  Moreover, the Defendant Authors did not even actually write the Article, or conduct the research or reach the conclusions set forth therein.  A-22, ¶46.  Rather, it was other, undisclosed agents of the Pharmaceutical Defendants who did.  *Id.*

In so submitting the Article for publication despite its known deficiencies, the Defendant Authors stood to benefit economically.  A-22, ¶47.  In particular, the number of articles published by academic physicians (such as Defendant Authors) and the prestige of the journals in which such articles are published (such as the Journal) is a determining factor in their compensation, promotions, honorariums, and the like.  *Id.*

In having its employee Defendant Ernst so submit the Article for publication, Defendant Premier also stood to benefit economically.  A-22, ¶48.  In particular, the publication of the Article reporting "findings" to the benefit of its customers (the Pharmaceutical Defendants) served as advertising for Premier's database and related services, and announced to pharmaceutical companies and other providers of medical products and services (such as Chiesi and Cornerstone) that the engagement of Premier in connection with similar self-serving "studies" would be to their economic benefit as well.  *Id.*

12

Notably, Defendant Author Bhatia is an Associate Editor for the Journal and Defendant Author Sekar is on the Editorial Board of the Journal. A-23, ¶52.

The Article, including its false claim that preterm infants treated with Curosurf® have lower mortality than those treated with Infasurf®, was published in "open access" format by the Journal on September 1, 2011. A-24, ¶55. The Pharmaceutical Defendants paid Defendant Nature to publish the Article in such "open access" format. *Id.* ¶57. Submitters benefit from such "open access" publication by way of access to such by non-subscribers. *Id.* ¶56.

The Journal is the "official journal" of the Section on Perinatal Pediatrics of the AAP, which is the United States' preeminent organization for physicians who practice in general pediatrics and its sub-specialties, including neonatology. A-24, ¶¶58, 59. Journals which the AAP sanctions or otherwise endorses (like the Journal) have considerable clout with and influence over practicing physicians and the treatments they prescribe. A-24, ¶60. Immediately upon the Article's publication, and in recognition of the Journal's caché with the prescribing community, Defendant Cornerstone issued a press release touting the Article and began distributing the Article to current and potential customers, including hospitals and physicians nationwide which currently use Infasurf®. A-25, ¶61. At the same time and for the same reasons, Defendant Chiesi also touted the Article by, among other things, including reference thereto and repeating its "conclusions"

13

on its website. A-25, ¶62. Such promotional use of the Article by the Pharmaceutical Defendants was in direct circumvention of United States Food and Drug Administration prohibitions on making product efficacy claims absent FDA approval (given only on the basis of legitimate science). A-25, ¶63.

Without the LOS data, the conclusions of the Article are unreliable and therefore misleading. A-25, ¶67. Had the Article presented the Curosurf® patients as having both a lower mortality and a shorter LOS, it would be obvious to readers that the differences in the results were a result of differences in the groups of patients treated, not of any differences in the effect of the particular lung surfactant administered. *Id.*

## SUMMARY OF ARGUMENT

ONY's Complaint alleged causes of action for violation of the Lanham Act, GBL §349 and tortious interference with contractual relations against the Pharmaceutical Defendants as well as a claim for injurious falsehood against each of the Defendants. ONY's claims against the Pharmaceutical Defendants were predicated not just on the content of the Article itself, but also on its post-publication secondary dissemination for marketing purposes. However, the District Court based its decision on the Article proper and never addressed the secondary dissemination of the Article, which serves as an independent basis for ONY's claims.

14

The District Court erred in finding that the Article constituted non-actionable opinion, thereby dismissing ONY's Lanham Act, GBL §349 and injurious falsehood claims.  As a threshold matter, the District Court's dismissal was premature.  In its Decision, the District Court presumptively stepped into the shoes of the "reasonable reader" and determined that the target audience would know what facts were omitted from the Article (*i.e.,* LOS data) and those that weren't.  However, such a determination is best left for a summary judgment motion after discovery.

More importantly, however, is that the Article contains false statements of fact.  The Article states on no fewer than six occasions that ONY's product resulted in a 49.6% or significantly "greater likelihood of death" than the Pharmaceutical Defendants' product.  Contrary to the District Court's decision, such statements are presented as facts, not "non-actionable hypothesis based upon limited and articulated facts."  A-259.  Even if the Article were opinion, the  Supreme Court has held that opinion is actionable if the facts relied upon "are either incorrect or incomplete" or the "assessment of them is erroneous."  *Milkovich v Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990)).

At the pleading stage, ONY has plainly alleged sufficient facts to render its claims based upon the Article plausible.  In particular, ONY has alleged that Defendants intentionally omitted the LOS data (which they knew to be significant)

15

as well as references to other articles and publications which contradicted their "findings" (even though the Article purports to represent all the known literature). As a result, the District Court erred in dismissing ONY's Lanham Act, GBL §349 and injurious falsehood claims solely on the basis that the Article was non-actionable opinion.

The District Court also erred in never addressing the post-publication use of the Article in marketing material for the benefit of the Pharmaceutical Defendants. Even where an article or publication is deemed non-actionable, the secondary dissemination of that Article for commercial use may nonetheless render the material subject to suit depending on how and in what context the Article is redistributed. ONY has adequately alleged that the Pharmaceutical Defendants' secondary dissemination of the Article violates the Lanham Act and GBL §349 and is sufficient to sustain a claim for injurious falsehood. Indeed, ONY moved for expedited discovery on this basis, which the District Court denied as moot.

In addition to arguing that the Article could not form the basis of an injurious falsehood claim against them because it is opinion, the Defendants also asserted that the Complaint failed to sufficiently allege malice and special damages. This issue was never addressed by the District Court and therefore is presented before this Court *de novo*. The gravamen of the Defendants' arguments was that ONY failed to prove malice; however such "proof" is not required at the

16

pleading stage.  Rather, ONY's Complaint (or its proposed amended complaint) sufficiently alleges that each of the Defendants either knew that the statements in the Article or its secondary dissemination were false or acted with reckless disregard as to their truth or falsity.  Further, ONY's Complaint and its proposed amended complaint adequately pleaded special damages.  With respect to the proposed amended complaint, ONY only learned of specific customers lost after it filed its Complaint.

The District Court also erred in dismissing ONY's claim for tortious interference against the Pharmaceutical Defendants.  In its Decision and Order, the District Court dismissed this cause of action because ONY allegedly failed to meet the New York standard requiring wrongful means.  A-263.  Just as it did elsewhere, the District Court held ONY to a standard of what must ultimately be proven at trial, not what must merely be pled.  In pleading that the Pharmaceutical Defendants committed other independent torts in connection with the Article and its secondary dissemination, ONY adequately pleaded a claim for tortious interference which was improperly dismissed by the Court.

The District Court also erred in dismissing the Complaint as against the Defendant Authors for lack of personal jurisdiction, as these defendants expressly consented to the jurisdiction of the New York courts when they submitted the Article for publication.

17

In response to the claimed pleading deficiencies raised by the Defendants, ONY cross-moved to amend the complaint, which the District Court denied as futile. A-263. However, such an amendment would not be futile, especially as to ONY's claims stemming from the Pharmaceutical Defendants' secondary dissemination of the Article – claims which the District Court never addressed. As a result, the District Court abused its discretion in denying ONY's cross-motion to amend.

## ARGUMENT

**I.    THE DISTRICT COURT ERRED IN DISMISSING ONY'S CAUSES OF ACTIONS UNDER THE LANHAM ACT, GBL §349, AND THE TORT OF INJURIOUS FALSEHOOD ON THE GROUNDS THAT THE ARTICLE IS A NON-ACTIONABLE STATEMENT OF OPINION**

Without any discovery and relying only on select allegations in the Complaint, the District Court improperly dismissed ONY's causes of action for violation of the Lanham Act, GBL §349 and injurious falsehood on the premature and incorrect assessment that the Article is a statement of opinion and therefore immune from suit. Whether a statement constitutes fact or opinion is a question of law. *Trump v. Chicago Tribune Co.*, 616 F.Supp. 1434, 1435 (S.D.N.Y. 1985). Consequently, the District Court's decision on this point is reviewed *de novo*.

A.    The District Court's Determination That the Article Is
       Non-Actionable Opinion Was Premature

Determining whether a statement is one of fact or rather one of opinion is

not an easy task, and is often resolved only after discovery has taken place. For

example, in *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 241-242 (1991),

*cert. denied*, 500 U.S. 954 (1991), the central issue was whether a letter to the

editor − usually opinion − contained actionable statements of fact. Ultimately that

court upheld the dismissal of the complaint as non-actionable opinion, but only on

summary judgment and only <u>after</u> extensive discovery, including the 14-day

deposition of the defendant. *See also, Gross v. New York Times Co.*, 82 N.Y.2d

146, 151 (1993) (reversing lower court's dismissal of complaint for failure to state

a claim, as the "articles contain defamatory assertions that a reasonable reader

would understand to be advanced as statements of fact"); *Porous Media Corp. v.*

*Pall Corp.,* 1998 U.S. Dist. LEXIS 23651, at *21-22 (D. Minn. June 3, 1998)

(analyzing Lanham Act claim utilizing the four-part test in *Gordon and Breach*

*Science Publishers S.A., STBS., Ltd. v. American Institute of Physics*, 859 F.Supp.

1521 (S.D.N.Y. 1994) ("*Gordon & Breach I*"), and refusing to determine the scope

of the distribution of press releases and whether the alleged statements were ones

of opinion on a motion to dismiss pursuant to FRCP 12(c) since "the Court may be

required to determine whether the statements are true, false, or misleading" which

is "more appropriately discussed in the summary judgment context").

Consequently, the District Court's analysis of the Article was premature at this pleading stage, as ONY has sufficiently <u>alleged</u> that the Article itself contains false representations of fact, not honest opinion (as discussed next).

### B. The Article Does Not Constitute Non-Actionable Statements of Opinion

Initially, it should be noted that in its Decision and Order, the District Court failed to specify whether the Article, or its subsequent use in secondary disseminations, constituted commercial speech, a necessary predicate to a Lanham Act claim. In describing the Article as akin to advertising, however, the District Court clearly treated the Article as commercial speech.

In evaluating whether a statement is opinion rather than fact, the dispositive inquiry is whether the reasonable reader would have concluded that the statement conveyed facts. *Gross,* 82 N.Y.2d at 152. Generally, "a statement of opinion that is accompanied by a recitation of the facts on which it is based" is not actionable, whereas "a statement of opinion that implies a basis in facts which are not disclosed to the reader or listener" is actionable – not because the statement is one of fact, but because it implies there are undisclosed detrimental facts upon which the opinion has been based. *Id.* at 153-154. In *Milkovich*, 497 U.S. at 18-19, the Supreme Court added that "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either <u>incorrect or incomplete</u>, or if his

20

assessment of them is erroneous, the statement may still imply a false assertion of fact."  (Emphasis added.)

To determine whether speech is opinion or fact, New York courts apply a three-part test:  "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact."  *Gross*, 82 N.Y.2d at 153 (citations and quotations omitted).

As noted and quoted above, ONY alleges the Article contains multiple false statements of fact as to the incidence of mortality of infants treated with calfactant (ONY's product) versus poractant alfa (Defendant Chiesi's product).  The Article states on no fewer than six occasions that Infasurf® (*i.e.*, calfactant) **unqualifiedly** has "a greater likelihood of death" than Curosurf® (*i.e.*, poractant alfa).[4]  Contrary to the District Court's conclusion, these unadorned statements are not "non-actionable hypothesis based upon limited articulated facts."  A-259.  A review of

_____

[4] As part of its motion to amend, ONY submitted a proposed amended complaint which also identified these statements as false or misleading statements of fact.  A-205.

the statements under *Gross* clearly demonstrates that they are assertions of fact under New York's three-part analysis.

1.  *The Language of the Article Has a Precise Meaning Which Is Readily Understood*

The language of the Article has precise meaning which is readily understood; there is nothing ambiguous about the phrase "greater likelihood of death." A-49. Evaluated through the lens of the average reader, the Article clearly states that the use of Infasurf® results in more deaths than Curosurf®. Indeed, the average reader would be surprised to learn that the authors of a scientific article are doing no more than expressing mere subjective "opinion" based upon detailed (and presumably provable and reproducible) statistical analysis in reporting a "greater likelihood of death." Indeed, where Defendants Chiesi, Cornerstone and the Authors intended to signal an "opinion" in the Article, they chose to couch it in terms of "explanations" that were "possible" and "most likely." A-51. The above-listed statements, however, contain no such equivocation.

2.  *The Statements Are Capable of Being Proven True or False*

The statements about infant mortality are obviously capable of being proven true or false. While the Defendants may argue that there are circumstances which make their statements qualifiedly true, that is simply not the way the information is presented.

22

3.   *The Context of the Statements Indicate They Are*
     *Presented as Fact, Not Opinion*

Finally, the context of the Article and the statements it contains support the conclusion at this preliminary stage that they may convey fact, not just simply opinion.  Here, the statements were published as part of an Article in a scientific journal.  While journal articles may, when read as a whole, convey opinion, they may equally convey fact or be of a mixed nature.

Of the three factors used by New York courts in assessing statements, context may be the most important, as it is context which helps the reader understand the nature of the statement.  For example, letters to the editor or submissions to op-ed pages are routinely regarded as opinion.  *See*, *Immuno AG.*, 77 N.Y.2d at 253 (holding the statements in a letter to the editor to be non-actionable, noting that "the common expectation of a letter to the editor is not that it will serve as a vehicle for the rigorous and comprehensive presentation of factual matter ..." (citation and quotations omitted)); *Brian v. Richardson*, 87 N.Y.2d 46, 54 (1995) (dismissing claim based upon article published on opinion page as "both the immediate context of the article itself and the broader context in which the article was published made it sufficiently apparent to the reasonable reader that its contents represented the opinion of the author").

In its Decision and Order, the District Court attempted to illustrate why the Article is opinion and not fact by relying <u>solely</u> on the omission of the LOS data (A-257), concluding somehow that the average reader of the Article would know what data was missing and would treat the statements regarding infant mortality as "debatable hypothesis rather than assertions of unassailable fact."  A-259.  "A greater likelihood of death," however, sounds nothing like "debatable hypothesis."  Moreover, significantly more than LOS data was alleged to be missing and incorrect in the Article – information which was <u>not</u> signaled to the reader (*Gross*, 82 N.Y.2d at 153) by the Article itself.  In addition to the LOS data, the Article fails to reference other articles and prior publications and disseminated information which uniformly contradict the Article and known to the Defendants.  A-25, ¶65.  In fact, the Article on its face purports to identify all relevant publications, but taking ONY's allegations as true, it fails to identify at least one article on the same subject matter because it contradicts the Article's conclusions.  A-22, ¶44.  These clear omissions would not be readily ascertainable by a reading of the Article alone and mislead the reader about the facts upon which the Article is based.

The Article admits that the data was "adjust[ed] for patient characteristics <u>such as</u> gestational age and BW."  A-51 (emphasis added).  In using the phrase "such as" and omitting reference to LOS, it is unclear as to what all the patient characteristics were and how they were "adjusted," thereby presenting an issue as

to whether all of the facts upon which the Article's purported "opinions" were
based were communicated to the reader.  *Gross*, 82 N.Y.2d at 153-154.

ONY also alleged that the Defendant Authors were not disinterested
academic writers, but were paid consultants to the Pharmaceutical Defendants
compensated for the Article's results.  A-19, ¶¶28, 29, 31; A-21, ¶42; A-22, ¶45.
ONY further alleged that the Article was not written by the Defendant Authors, but
that it was written by other employees of the Pharmaceutical Defendants.  A-22,
¶46. Finally, ONY alleged that the Article was published, in part, due to
Defendants Bhatia and Sekar's roles as editors of the Journal.  A-23, ¶53.  In
support of its holding that the Article was non-actionable opinion, the District
Court found that the "Conflict of Interest" section would have advised the reader of
the Defendant Authors' relationships with the Pharmaceutical Defendants;
however, the District Court **never** addressed ONY's allegations that other parties
may have written the Article or the failure of Defendants Bhatia and Sekar to
advise the reader as to their editorial positions with the Journal – the publisher of
the Article.  In failing to include this information in the "Conflict of Interest"
section, the Defendants have knowingly concealed relevant information from the
reading public, which is not readily apparent from the face of the Article.

As stated in *Milkovich*, 497 U.S. at 19, an opinion may be actionable where
the facts upon which the opinion is based are "incorrect or incomplete" or an

"assessment of them is erroneous." Here, the Article not only omits facts, but the facts upon which it purports to base its opinion are incorrect or incomplete (*i.e.,* the only articles which are relevant are those which the Defendant Authors cited and the failure to disclose Defendants Bhatia and Sekar's relationship with the Journal or that the Article was in fact authored by others) and their assessment is erroneous (*i.e.*, consideration of LOS data leads to a different result).

Taken in the totality, the Article is anything but non-actionable opinion; rather, as ONY has alleged, it is a misrepresentation of fact which resulted in the improper dismissal of ONY's Lanham Act, GBL §349 and injurious falsehood claims.

## C.    ONY Has Sufficiently Pleaded a Claim Under the Lanham Act As the Article Is Actionable Commercial Speech

Where, as here, the Article is not opinion, ONY has sufficiently stated a claim under the Lanham Act. Section 43(a) of the Lanham Act specifically provides a cause of action for civil liability against:

> (1) Any person who, on or in connection with any goods or services, ... , uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which —
>
> …
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another

> person's goods, services, or commercial
> activities .…

15 U.S.C. § 1125(a)(1)(B).  Simply put, the Lanham Act provides redress for commercial advertising and promotion which is either explicitly untrue or implicitly false (*i.e.*, technically true, but likely to mislead).  Given the inherently commercial nature of Lanham Act claims, they are not entitled to the same First Amendment deference as claims sounding in defamation.  Commercial speech is constitutionally protected only when it is **truthful**.  *See, generally, Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 576 (1980) (Blackmun, J., concurring).  The commercial nature of the speech here is only reinforced by the fact that claims about drug efficacy are regulated by the FDA.

In this case, both the Article and its secondary dissemination (as discussed further in Section II (A), *infra*) support a claim under the Lanham Act against the Pharmaceutical Defendants.

27

1. *Plaintiff Has Sufficiently Pleaded a Claim for a Violation of the Lanham Act Based on the Article Itself*

   a) **The Article Constitutes Speech Used in Commercial Advertising or Promotion**

The District Court assumed − correctly − that the challenged statements were commercial in nature.  Discussion of why that is only reinforces that they also were not "opinion."

The threshold issue in any Lanham Act case is whether the complained-of material constitutes speech used in commercial advertising or promotion.  Indeed, it is the commercial nature of the speech which subjects false or misleading statements to restriction and removes it from the protective realm of the First Amendment.  In order for speech to constitute commercial advertising or promotion, the statement need only be:  (1) commercial in nature; (2) for the purpose of influencing consumers to buy defendant's goods or services; and (3) sufficiently disseminated to the relevant purchasing public.  *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56-58 (2d Cir. 2002); *Boule v. Hutton,* 328 F.3d 84, 90-91 (2d Cir. 2003).  Notably, both *Fashion Boutique* and *Boule* address what the plaintiff must **prove after discovery**, rather than what a plaintiff must **allege at the pleading stage**.  As discussed below, the Article constitutes commercial speech, and ONY has otherwise adequately pleaded

sufficient facts to meet the second and third prongs of the *Fashion Boutique* standard.

(1)   The Article Meets the Commercial Speech
      Prong of the Standard Articulated in
      *Fashion Boutique* and Its Progeny

The first prong of the "commercial advertising or promotion" standard requires that the speech be commercial.  In determining whether the speech at issue is commercial or noncommercial, the court is required to examine the subject speech as a whole.  The seminal case on the difference between commercial and noncommercial speech is *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983).

In *Bolger*, the defendant drug company challenged the constitutionality of a federal law which prohibited the mailing of any unsolicited advertising relating to contraception.  Defendant, who was the manufacturer and distributor of Trojan brand condoms, sought to distribute three types of advertising or promotional material:  (1) multi-page promotional flyers intended for pharmacies, which contained product descriptions and pricing; (2) single-page flyers promoting prophylactics in general, and (3) informational pamphlets with titles such as "Condoms and Human Sexuality" and "Plain Talk about Venereal Disease," which also contained references to defendant and its Trojan brand.  There was no question that the flyers containing price and product information "f[e]ll within the

29

core notion of commercial speech" (*id*. at 66); however, the commercial nature of

the pamphlets (which contained general information of public interest along with

references to defendant's products) was not so clear. Upon examining the

pamphlets in their totality, the Court stated:

> The mere fact that these pamphlets are conceded to be
> advertisements clearly does not compel the conclusion
> that they are commercial speech. Similarly, the reference
> to a specific product does not by itself render the
> pamphlets commercial speech. Finally, the fact that
> Youngs has an economic motivation for mailing the
> pamphlets would clearly be insufficient by itself to turn
> the materials into commercial speech.
>
> The combination of *all* these characteristics, however,
> provides strong support for the ... conclusion that the
> informational pamphlets are properly characterized as
> commercial speech.

*Id.* at 66-67 (citations and footnotes omitted; emphasis in original). The Court

further added that all of the enumerated characteristics need not be present for

speech to be commercial. *Id*. at 67, n.14. Here, the Article clearly constitutes non-

protected commercial speech, subjecting the Pharmaceutical Defendants to

potential liability under the Lanham Act.

### (a) The Article Is Commercial Speech

Based upon the Supreme Court's ruling in *Bolger*, it is clear that whether

speech is commercial is predicated on its substance rather than its form. As a

result, even a published "article" can constitute commercial speech depending upon its nature and character. *See, e.g.*, *Gordon & Breach I*, 859 F.Supp. at 1540 (acknowledging that an academic journal article may be commercial speech, but is an "admittedly ambiguous situation" which requires a fact-based inquiry). Where, as here, the nature and content of the Article ceases to be neutral academic inquiry but rather is designed to be self-serving promotion, it should be treated as commercial speech.

In *Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108 (6th Cir. 1995), for example, the plaintiff and defendant were competitors in the manufacture and sale of beryllium-copper "plunger tips." The editor of a trade journal asked the defendant's president to write an article explaining a new manufacturing method developed and used by the defendant in the production of the tips. The defendant's president submitted an article which not only described the manufacturing process, but also generally praised the defendant and its products and touted its commitment to customer service. The journal published the article (as revised to eliminate the more blatantly promotional references), after which the defendant used the published article, in numerous formats, as promotional material. The plaintiff commenced an action in the Northern District of Ohio asserting, among other causes of action, a Lanham Act claim based upon the article itself as published in the trade journal. The defendant argued that the article *per se* was not commercial advertising or

31

promotion and was, therefore, beyond the reach of the Lanham Act; the district court agreed and dismissed the complaint.

On appeal, the Sixth Circuit reversed, finding that the article itself could well violate the Lanham Act. In reaching its decision, the *Semco* court relied on *Bolger* and found that the totality of the article, as well as the context of its submission, warranted commercial speech treatment, stating "[defendant] does not admit that the … article advertises for [defendant], but the article does refer generally to [defendant's] products, and a rational jury could easily find that [defendant] had an economic motivation for submitting the article through its president." *Semco*, 52 F.3d at 112-113. In *Semco*, the district court relied heavily upon the fact that the defendant did not pay to have the article published; however, the circuit court concluded that even without such payment, where there is a *quid pro quo* arrangement (both the journal and the company benefitted from the submission and publication), the speech may nonetheless be considered advertisement. *Id.* at 113-114.

In *Gordon & Breach I*, *supra*, the Southern District of New York likewise evaluated whether an article itself may constitute commercial speech for purposes of a Lanham Act claim. While the court reached a result opposite to *Semco* based on the particular article before it, it did so on different grounds and allowed the

32

prospect that in appropriate circumstances a journal article may constitute commercial speech.

In that case, plaintiffs brought an action alleging that articles published in the academic journals by not-for-profit defendants American Institute of Physics ("AIP") and American Physical Society ("APS") were "fundamentally misleading, both in their essential premise and in their execution." *Gordon & Breach I*, 859 F.Supp. at 1525-1526. The articles, written by an officer of APS, ranked various journals published in the field of physics (including plaintiff's for-profit publications) based upon "cost-effectiveness" and "impact." *Id.* at 1523. The defendants' journals ranked at the top of the list while the plaintiff's journals were ranked at or near the bottom. Just as in *Semco*, the plaintiff alleged that the articles themselves were promotional material intended to benefit defendants.

In analyzing the articles for their commercial speech, the court in *Gordon & Breach I* relied heavily on two factors: (1) the non-profit nature of the defendants and (2) the subject matter of the article. As noted by the court, "non-profit entities … have purposes beyond the solely commercial – purposes (publishing and the advancement of scientific inquiry) which implicate significant First Amendment concerns." *Id.* at 1540. Here, however, the Pharmaceutical Defendants are both **for-profit** entities. A-15, ¶¶2-4. With respect to the nature of the article, the *Gordon & Breach I* court specifically noted that the **product** which the articles

33

discussed "is a constitutionally protected one – academic journals, as opposed to, say, pain killers or motor oil." *Gordon & Breach I*, 859 F.Supp. at 1540-1541. In contrast, the Article here promotes a lung surfactant – the analytical equivalent of *Gordon & Breach I's* "pain killer."

Here, the Article itself constitutes commercial speech since it is alleged to be nothing more than a self-serving advertisement loosely disguised as neutral academic inquiry and designed to promote the commercial interests of the Pharmaceutical Defendants. As alleged in the Complaint, it was agents of Cornerstone/Chiesi who: **wrote** the Article (A-22, ¶46); **paid** the authors of the Article to submit it for publication (A-22, ¶45)[5]; **paid** for and manipulated the data (A-21, ¶43); and, **paid** the Journal a premium to publish the Article in an "open access" format to reach a broader audience. (A-24, ¶¶55, 56). A review of the Article does not refute these allegations (as evidenced by the "Conflicts of Interest" and "Acknowledgments" sections.) Not surprisingly, the unequivocal "result" of the Article – presented as fact – is that Article sponsor Chiesi/Cornerstone's product Curosurf® has a lower mortality rate than ONY's product Infasurf®.

---

[5] That the Defendant Authors (excluding Ernst) and Pharmaceutical Defendants appear herein by the same counsel obviously does nothing to contradict the Complaint's allegations that they were in league with each other.

(2)    <u>The Article Also Meets the Second and Third Prongs of the *Fashion Boutique* Standard</u>

Where the statements constitute commercial speech, a court must next determine if there are sufficient allegations that the offending statements were made for the purpose of influencing customers to buy the defendant's goods and that they were disseminated to the relevant purchasing public – essentially, that the statements were advertising or promotion.  Here, the Complaint alleges that the Pharmaceutical Defendants wrote the Article (A-22, ¶46), "cherry-picked" the data (A-21, 22, ¶43), failed to cite to (or otherwise advise the target audience of) known contradictory literature (A-22, ¶44), manipulated the data to obtain the desired result (A-21, ¶42), then capitalized on the prestige of the Journal by disseminating the Article to current and potential customers, hospitals and physicians who presently use Infasurf®, all as part of an orchestrated marketing campaign (A-25, ¶61; A-27, ¶73).

Plaintiff has thus adequately alleged that the Article is commercial advertising and promotion within the meaning of the Lanham Act so as to withstand a motion to dismiss.

35

**D.    ONY Has Sufficiently Pleaded a Claim Under GBL §349
in Connection With the Article's Initial Publication**

New York GBL §349 prohibits "[d]eceptive acts or practices in the conduct

of any business, trade or commerce or in the furnishing of any service" and

provides that a private party may bring a claim for damages and to enjoin the

behavior of an offending party.  GBL §349(h).  As stated in *DirecTV, Inc. v.*

*Rowland*, 2005 U.S. Dist. LEXIS 2454, *5-6 (W.D.N.Y. Jan. 22, 2005), in order to

state a claim under GBL §349, "a plaintiff must allege that (1) the alleged

deceptive acts are directed at consumers, (2) the alleged acts misled consumers in a

material way, and (3) injury resulted from the deceptive acts."  Additionally, the

complaint "must allege facts showing injury or potential injury to the public."  *Id.*

at *6 (quotations and citation omitted).  Finally, "the statute does not preclude an

action by one business against another, [but] the gravamen of the complaint must

be consumer injury or harm to the public interest."  *Azby Brokerage, Inc. v. Allstate*

*Insurance Co*., 681 F.Supp. 1084, 1089 n.6 (S.D.N.Y. 1988).  "The critical

question, then, is whether the matter affects the public interest in New York, not

whether the suit is brought by a consumer or a competitor."  *Securitron Magnalock*

*Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995), *cert. denied*, 516 U.S. 1114

(1996).  Plaintiff has sufficiently pleaded its cause of action under GBL §349

against the Pharmaceutical Defendants.

In its Complaint, ONY alleges that both the Article and its secondary promotional dissemination are directed at consumers – hospitals and physicians who purchase or affect purchasing decisions for infant surfactants − and describes the subject information as "influence[ing] purchasing decisions by hospitals and prescribing decisions by neonatologists."  A-25, ¶¶61, 62; A-26, ¶69.  Plaintiff also alleges that the false statements in the Article misled the consumers in a material way.  A-20, ¶37; A-22, ¶44; A-25, ¶61.

Finally, the Complaint is replete with factual allegations that the Pharmaceutical Defendants' actions in manipulating the facts to support the desired outcome conveyed in the Article have harmed the public interest.  The principal point of the Article is that Defendants' product results in a lower infant mortality than ONY's product.  As discussed above, the Article on no fewer than six occasions expressly states that the use of ONY's product results in a 49.6% greater likelihood of death than Defendants' product.  Defendants cannot credibly assert that fallacious infant mortality claims do not affect or harm the public interest.

### E.    ONY Has Sufficiently Pleaded a Claim for the Tort of Injurious Falsehood in Connection With the Article's Initial Publication

Under New York law, the elements of a claim for injurious falsehood are: (1) falsity of the alleged statements; (2) publication to a third person; (3) malice; and (4) special damages.  *Drug Research Corp. v. Curtis Publishing Co.*, 7 N.Y.2d

435, 440 (1960). Plaintiff has sufficiently pleaded allegations to sustain its claim for injurious falsehood as to the Article.

As discussed above, the factual falsity of the statements in the Article was sufficiently alleged at the pleading stage. Moreover, there is no dispute that the Article was published to third persons. Consequently, ONY has satisfied the first two elements of an injurious falsehood claim related to the publication of the Article. As is discussed in Section III, ONY has also pleaded or has moved to amend its complaint to plead malice and special damages such that dismissal of ONY's claim for injurious falsehood was improper.

## II. THE DISTRICT COURT ERRED IN DISMISSING ONY'S CAUSES OF ACTIONS UNDER THE LANHAM ACT, GBL §349 AND INJURIOUS FALSEHOOD RELATED TO THE SECONDARY DISSEMINATION OF THE ARTICLE

Even if the Article itself were non-actionable opinion, the District Court still erred in dismissing the Lanham Act, GBL §349 and injurious falsehood claims against the Pharmaceutical Defendants for their secondary dissemination of the Article. Indeed, at no point did the District Court even address ONY's claims that the secondary dissemination of the Article constituted a separate basis to sustain the causes of action, even if the Article itself was non-actionable.

**A.    ONY Sufficiently Pleaded a Claim Under the Lanham Act
Related to the Secondary Dissemination of the Article**

In Section I(C), *supra*, ONY delineates the standard required under the

Lanham Act for evaluating false or misleading statements of fact.  In addition to

the Article itself, the Pharmaceutical Defendants' post-publication use and

dissemination of the Article to promote Curosurf® also constitutes commercial

speech giving rise to liability under the Lanham Act.  In this regard, the case at bar

is plainly analogous to *Gordon & Breach I*.  As noted above, the plaintiff there

brought a Lanham Act claim challenging not only the journal article as published,

but alleged also that the defendants' secondary dissemination of the article to the

relevant purchasing public along with press releases about the article constituted

commercial speech.  859 F.Supp. at 1536.

Initially, the court in *Gordon & Breach I* analyzed whether the article itself

constituted commercial speech, and was therefore actionable as a matter of law.

Ultimately, as noted above, that court found that the article itself was non-

actionable non-commercial speech.  In contrast, however, the court recognized that

the secondary dissemination of the article <u>was</u> indeed actionable commercial

speech.  Further, the court declined to address on defendants' motion to dismiss

whether the materials used in the secondary dissemination were false or

misleading, since "[w]hether [the] articles are 'false or misleading' within the

39

meaning of the Lanham Act raises questions of some interest and significance, but not ones that it is appropriate to explore in the present posture of the case. The falsity of advertising is an issue of fact." *Gordon & Breach I*, 859 F.Supp. at 1531-1532.

Regarding the dissemination of the results of the articles to librarians – the relevant purchasing public – the court stated that "distribution of survey results favoring defendants' products to an audience that represents the core consumers of those products" constitutes "activities explicitly promotional in nature." *Id.* at 1544. As a result, the court properly denied the defendants' motion to dismiss based upon the secondary dissemination of the article. While the plaintiff's entire Lanham Act claim was dismissed later on, that occurred only <u>after</u> discovery and a seven-day bench trial. *OPA (Overseas Publishing Association) Amsterdam BV v. American Institute of Physics*, 973 F.Supp. 414 (S.D.N.Y. 1997).

In its Complaint, ONY alleges that "[i]mmediately upon the Article's publication" the Pharmaceutical Defendants "began distributing the Article, either in part or in whole, to current and potential customers, including hospitals and physicians nationwide." A-25, ¶61 (emphasis added). In using the Article for such promotional purposes, the secondary dissemination (*i.e.*, direct marketing or promotion to hospitals or physicians) alleged by ONY clearly constitutes commercial speech.

40

Once determining that statements constitute commercial speech, a court must next determine if there are sufficient allegations that the offending statements were made for the purpose of influencing customers to buy the defendant's goods and that they were disseminated to the relevant purchasing public – essentially, that the statements were advertising or promotion. Here, with respect to the secondary dissemination, the Complaint clearly alleges that the secondary dissemination of the Article was orchestrated by the Pharmaceutical Defendants to capitalize on the prestige of the Journal, and the imprimatur the AAP places thereon as the official journal of its Section of Perinatal Pediatrics. A-24, ¶59. Indeed, even thought Defendant Authors had presented abstracts (not full articles) on the comparable mortality of Curosurf® and Infasurf® prior to the Article's publication, the Pharmaceutical Defendants engaged in their marketing blitz only **after** the Article was published in the Journal. A-25, ¶61; A-27, ¶73.

ONY thus alleges that the Pharmaceutical Defendants utilized the Article post-publication to sell its product. Just as with *Gordon & Breach I*, ONY does not need, on a motion to dismiss, to establish precisely how the Article was used in secondary disseminations, merely that it was and that through those channels the purchasing public was misled. Moreover, even if the Article − taken as a whole – is non-actionable commercial speech, excerpts from the Article, taken out of context and used in marketing material, would not present the reader with the

41

necessary information to discern the misleading nature of the statement (*i.e.*, that Defendant Chiesi's product results in a 49.6% lower infant mortality rate than ONY's product). Indeed, given the infinite variability of marketing material, ONY properly moved for expedited discovery so that these very issues could be explored. The District Court, however, did not even consider ONY's motion, even though ONY had good cause and immediate discovery would have clarified (or resolved) numerous issues. Rather than pursuing an expedited path, the District Court denied ONY's motion as moot and, in so doing, has left open questions of fact which cannot, and should not, be resolved on a motion to dismiss.

ONY sufficiently pleaded that that the secondary dissemination of the Article violated the Lanham Act and the District Court's dismissal of that claim was improper as a matter of law.

### B. ONY Sufficiently Pleaded a Claim Under GBL §349 and For Injurious Falsehood Related to the Secondary Dissemination of the Article

Similarly, ONY's claims against the Pharmaceutical Defendants for violation of GBL §349 and for Injurious Falsehood are predicated not only on the Article itself, but the secondary dissemination of the Article. A-28, ¶80; A-34, ¶¶116-118. Having failed to even address the secondary dissemination issue, the issue is before this Court *de novo*.

42

    *1.    ONY Has Sufficiently Pleaded That the Secondary*
             *Dissemination of the Article Violates GBL §349*

ONY has adequately alleged that the secondary dissemination of the Article

is just as actionable under the GBL as its initial publication.  Most pertinent to the

analysis is ONY's allegation that by promoting a lower mortality rate of the

Pharmaceutical Defendants' product over ONY's, the Pharmaceutical Defendants

are making product efficacy claims about their product detrimental to the

consuming public.

*Securitron Magnalock*, 65 F.3d 256, is analogous.  In that case, the

plaintiff – a manufacturer of electromagnetic locks − commenced an action against

its competitors under GBL §349, based in part upon letters which the defendants

had sent to the New York City Bureau of Standards and Appeals ("BSA").  The

BSA was the city agency having authority to approve electromagnetic locks for use

in city construction projects.  The matter ultimately went to trial, with the plaintiff

prevailing on its GBL claim.  On appeal, the defendants argued that the plaintiff

did not have standing to assert a claim under GBL §349 as the plaintiff, even after

trial, had not demonstrated any harm to the public, maintaining that the dispute was

nothing more than a commercial disagreement.  The court rejected that argument,

stating that "the harm to public was manifest" because the defendants gave false

information to a "regulatory agency primarily concerned with the safety of the

43

public."  *Id.* at 264.  Similarly here, ONY has alleged that Defendants' false publications skirt FDA regulations and affect issues of public health.  A-25, ¶63; A-34, ¶118.

As a result, ONY has sufficiently pleaded a claim under GBL §349 for the secondary dissemination of the Article.

> 2.   *ONY Has Sufficiently Pleaded That the Secondary Dissemination of the Article Supports a Claim For Injurious Falsehood*

For the reasons discussed above, ONY has satisfied the first two elements of an injurious falsehood claim (*i.e.*, falsity and publication) as to the Article's secondary dissemination.  As discussed next in Section III, ONY has also pleaded or has moved to amend its complaint to plead malice and special damages such that dismissal of ONY's claim for injurious falsehood was improper.

**III.   ONY'S COMPLAINT OR ITS PROPOSED AMENDED COMPLAINT SUFFICIENTLY PLEADED MALICE AND SPECIAL DAMAGES IN CONNECTION WITH PLAINTIFF'S CLAIMS FOR INJURIOUS FALSEHOOD**

In its Complaint, ONY alleged claims of injurious falsehood against each of the Defendants.  Each Defendant sought to dismiss those claims, alleging that the Article did not contain false statements of fact and that ONY failed to sufficiently allege malice and special damages.  Having erroneously determined that the Article constituted non-actionable opinion, the District Court never addressed

44

whether the injurious falsehood claims sufficiently pleaded malice and special

damages.  Consequently, the issue is now before this Court for review *de novo*.

For the reasons that follow, ONY has sufficiently pleaded in its Complaint

or its proposed amended complaint the remaining elements of an injurious

falsehood claim.

### A.    Malice

As defined by the courts, "[a]ctual malice requires proof that the publisher

had a subjective awareness of either the falsity or probable falsity of the

defamatory statement, or acted with reckless disregard of … its truth or falsity."

*Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 182 (2d Cir. 2000).  At

the pleading stage, it is sufficient for ONY to allege simply that "the allegedly false

statements in [the article] were known by Defendant to be false when they were

made, or were made by it with recklessness, malice and intent to injure Plaintiff."

*Charles Atlas, Ltd. v. Time-Life Books, Inc.*, 570 F.Supp. 150, 155 (S.D.N.Y. 1983)

(quotations omitted); *see also Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.*, 7

A.D.2d 441, 444 (1st Dept. 1959) (actual malice means a statement made

"maliciously or with the intention to harm another, or so recklessly and without

regard to its consequences, that a reasonably prudent person should anticipate that

damage to another will naturally follow.").  Further, where the acts of defendants

are otherwise actionable, it is premature to require ONY to definitively show at the

pleading stage that the Defendants acted with actual malice. *Alianza Dominicana, Inc. v. Luna*, 229 A.D.2d 328, 329 (1st Dept. 1996), *lv. to appeal dismissed*, 89 N.Y.2d 1029 (1997) ("Plaintiff has met the threshold test of establishing that the [alleged defamatory] remarks … are actionable and after discovery has been completed, it will be the burden of plaintiff Alianza ... to prove that defendant Luna's remarks were false and that they were made with actual malice.").

For pleading purposes, ONY has readily met at least the "reckless disregard" prong of the actual malice standard.

### 1. *Pharmaceutical Defendants*

ONY alleges that the Pharmaceutical Defendants either made false statements or that the statements were made with "reckless disregard of their truth or falsity" by specifically alleging that the Pharmaceutical Defendants (1) disregarded known LOS data (even though they had the data and, indeed, had previously recognized its significance) (A-19, 20, ¶¶32-27), (2) manipulated and "cherry picked" the data they did use (A-21, ¶40), and (3) omitted contradictory articles (A-22, ¶44), all to reach the desired outcome  (A-25, ¶65) – lower mortality rate for infants who were treated with their product.  Here, just as in *Charles Atlas*, ONY has sufficiently pleaded actual malice relative to the Pharmaceutical Defendants.

46

### 2. Defendant Authors

With respect to the Defendant Authors, ONY alleges that they either made false statements or that the statements were made with "reckless disregard of their truth or falsity" by specifically alleging that the Defendant Authors (1) disregarded known LOS data (even though they had the data and, indeed, had previously recognized its significance) (A-19, 20, ¶¶32-37), (2) manipulated and "cherry picked" the data they did use (A-21, ¶40), and (3) omitted contradictory articles (A-22, ¶44), all to reach the desired outcome (A-25, ¶65) – lower mortality rate for infants treated with the product of the Pharmaceutical Defendants, who they were paid by and beholden to.  Here, just as in *Charles Atlas*, ONY has sufficiently pleaded actual malice relative to the Defendant Authors.

### 3. Premier

Here, ONY has plausibly alleged that Premier, in selectively culling and omitting key data to reach the outcome paid for by the Pharmaceutical Defendants, acted "recklessly and without regard to its consequences."  As alleged, the Article was based upon a retrospective study of data plucked and manipulated by the Premier.  A-20, 21, ¶¶37, 40.  ONY additionally alleges that Premier and Ernst were induced to "cherry pick" and otherwise selectively cull the data to reach the outcome which their clients (the Pharmaceutical Defendants) wanted (*i.e.*, lower mortality in neonates treated with Curosurf®) (A-21, ¶42) and paid for.  A-32,

47

¶104; *see also* A-51 ("Conflict of Interest"). Where Premier was paid to knowingly and intentionally manipulate data to achieve a desired outcome and then permitted that result to be broadcast through one of their own (Defendant Author Ernst), ONY has alleged sufficiently that the Premier and Ernst acted with actual malice.

### B. Special Damages

ONY has also sufficiently pleaded special damages. In its Complaint, ONY alleges that as a result of the Defendants' collective actions, it has suffered a "diminution in the inherent value of its business in the amount of 10% to date (including in the amount of $7.6 million as measured by two times EBIDTA), … lessened borrowing capacity and diminished ability to attract capital and talent." A-29, ¶89.

While each of the Defendants asserted that ONY has alleged no more than "round numbers," in doing so they construe the law of special damages more narrowly than do the courts. Special damages "are limited to losses having pecuniary or economic value, and must be fully and accurately stated with sufficient particularity to identify actual losses." *Kirby v. Wildenstein*, 784 F.Supp. 1112, 1116 (S.D.N.Y. 1992) (citations and quotations omitted). Contrary to the Defendants' claims, it is not just the "roundness" of the numbers which serves as the litmus test for special damages, but also the lack of any attempt at identifiable

48

itemization.  *Compare Drug Research,* 7 N.Y.2d at 441 (dismissing the complaint where the alleged damage was $5,000,000 "with no attempt at itemization") *with Cromarty v. Prentice-Hall, Inc.*, 72 A.D.2d 782 (2d Dept. 1979).  In *Cromarty,* the plaintiffs had alleged "round numbers" of $60,000 and $9,000 related to loss in value of their house and out-of-pocket expenses incurred due to the statements which formed the basis for their injurious falsehood claim.  In assessing the plaintiffs' alleged damage, the court stated that the plaintiffs "adequately allege[] special damages, i.e., depreciation in the value of the house and out-of-pocket expenditures necessitated by the acts of third-part[ies] …, for which recovery is possible if plaintiffs can establish the requisite foreseeability."  *Id.* at 783 (citations omitted).  Here, a diminution in the value of ONY's business as measured by twice EBIDTA (earnings before income, depreciation, taxes and amortization) is a quantifiable and itemized measure of damages – not just a "round number."

In its initial Complaint, ONY could not yet identify any specific customers who were lost as a result of Defendants' action.  Where identification of lost clients is difficult and a defendant's comments are widely disseminated, a plaintiff's lost customers need not be named to survive a motion to dismiss.  *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F.Supp.2d 401, 406 (E.D.N.Y. 2004).  However, the week that ONY's responding briefs were due below, it learned of several customers who were jeopardized or lost as a result of the Article and its

49

dissemination.  Accordingly, ONY cross-moved to amend its complaint,
submitting a proposed amended complaint wherein ONY specifically identified
lost customers.  A-220, ¶84.

In addition, the affidavit of ONY's principal, as submitted in support of the
amendment, showed that the loss of business was directly related to the Article.  A-
151, ¶4.  Thus, ONY sufficiently alleged facts from which causation between the
Defendants' actions and harm to ONY can be inferred.

Accordingly, ONY sufficiently pleaded special damages requiring that all of
the motions to dismiss the injurious falsehood claims be denied.

## IV. THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFF'S CLAIM FOR TORTIOUS INTERFERENCE AS ONY HAS SUFFICIENTLY PLEADED WRONGFUL MEANS

The District Court also improperly dismissed ONY's last cause of action
against the Pharmaceutical Defendants for tortious interference with business
relations.  In its Complaint, ONY alleged that Defendants Chiesi and Cornerstone
interfered with both existing and prospective contracts ONY had with institutions
and physicians. A-33, ¶112.  At the time the original Complaint was filed, the
fallout from the Article's dissemination could not be specified, and the
Pharmaceutical Defendants moved to dismiss the tortious interference claim on
that basis.  However, the week that ONY's responding papers were due below, it
learned of several customers and prospective customers who changed their minds

50

about purchasing ONY's surfactant as a result of the Article and its secondary dissemination. A-150–A-153. Consequently, ONY moved to amend its complaint, which was incorrectly denied.

Based upon the allegations in the proposed amended complaint, ONY stated a claim at this early stage for tortious interference with prospective business advantage. Under New York law, to prevail on a claim for tortious interference with prospective contracts, a plaintiff "must prove that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003). Obviously, at the pleading stage, Plaintiff need only allege sufficient facts which, when taken as true, would support the elements of the claim.

Here, the District Court dismissed ONY's claim for tortious interference on the erroneous conclusion that ONY failed to meet the third prong of the test. A-262. That prong requires the plaintiff to allege either that Defendants undertook the alleged action with the sole purpose of harming the Plaintiff or that the Defendants employed "wrongful means." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190-191 (2004).

51

The New York Court of Appeals' decision in *Carvel* is the seminal case regarding what constitutes "wrongful means."  Wrongful means "are acts that would be criminal or independently tortious ...."  *Carvel*, 3 N.Y.3d at 192.  In its Decision and Order, the district court relied on an earlier definition of wrongful means as articulated in *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183 (1980) and concluded that ONY failed to allege anything falling within it.  However, the list identified in *Guard-Life* was not an exhaustive one, and with *Carvel* and its progeny, New York State courts have made it abundantly clear that "wrongful means" includes independent torts.  *See, e.g., Stapleton Studios, LLC v. City of New York*, 26 A.D.3d 236, 237 (1st Dept. 2006) (stating that wrongful conduct may be based on allegations of defamation).

Here, ONY predicates its claim for tortious interference on at least three independent torts:  violation of the Lanham Act, violation of GBL §349, and its tort claim for injurious falsehood.  Moreover, ONY's claim for tortious interference is not based upon the Article alone, but also its secondary dissemination to the relevant purchasing public – hospitals and physicians.  As discussed in Section II, *supra*, even if the Article itself was non-actionable opinion, there are questions of fact regarding its secondary dissemination which militate against dismissal of the Complaint (either in its original or proposed amended form).  As a result, Plaintiff's

52

claim for tortious interference was erroneously dismissed for lack of <u>alleging</u>

wrongful means.

**V.     THE DISTRICT COURT ABUSED ITS DISCRETION IN REFUSING TO PERMIT ONY TO AMEND ITS COMPLAINT, AS SUCH AN AMENDMENT WOULD NOT HAVE BEEN FUTILE**

Denial of a motion to amend a complaint is generally reviewed for an abuse

of discretion.  However, where, as here, the District Court curtly denied Plaintiff's

motion to amend without providing any supportable justification, such a denial

constitutes an abuse of discretion:

> In the absence of any apparent or declared reason -- such
> as undue delay, bad faith or dilatory motive on the part of
> the movant, repeated failure to cure deficiencies by
> amendments previously allowed, undue prejudice to the
> opposing party by virtue of allowance of the amendment,
> futility of amendment, etc. -- the leave sought should, as
> the rules require, be 'freely given.'  Of course, the grant or
> denial of an opportunity to amend is within the discretion
> of the District Court, but outright refusal to grant the
> leave without any justifying reason appearing for the
> denial is not an exercise of discretion; it is merely abuse
> of that discretion and inconsistent with the spirit of the
> Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).  Here, the District Court stated only

that since it had concluded that the Article itself was non-actionable opinion

(again, the District Court <u>never</u> addressed the secondary dissemination of the

Article), any amendment to the Complaint would be futile.  A-263.  As discussed

above, the amendment to the Complaint would not have been futile as the amendments sought to add specific lost business as a result of Defendants' actions – information which was unknown to (albeit suspected by) ONY at the time of initial filing.

Having improperly analyzed and dismissed ONY's causes of action, the District Court abused its discretion in denying ONY's motion to amend.

## VI. THE DISTRICT COURT ERRED AS A MATTER OF LAW IN FINDING NO PERSONAL JURISDICTION OVER THE DEFENDANT AUTHORS, AS THERE WERE SUFFICIENT CONTACTS STEMMING FROM THE PUBLICATION OF THE ARTICLE

On appeal, this Court reviews "district court decisions on personal jurisdiction for clear error on factual holdings and de novo on legal conclusions." *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 36 (2d Cir. 2001) (citation omitted). Here, the District Court's finding of lack of personal jurisdiction was based upon an incorrect legal conclusion and is therefore reviewed by this Court *de novo*.

In its Complaint, ONY asserted causes of action for injurious falsehood against the Defendant Authors, who each moved to dismiss based on a lack of personal jurisdiction. In response, ONY showed that personal jurisdiction existed over each of the Defendant Authors pursuant to CPLR §302(a)(1) based, in part, upon a "License to Publish" they entered into with Defendant Nature, whereby

54

each consented to non-exclusive jurisdiction in the State of New York in connection with the publication of the Article. The License itself was sufficient to grant personal jurisdiction, and also established sufficient minimum contacts with the State such that the Defendant Authors were subject to long-arm jurisdiction.

**A.** **In Executing the License to Publish, the Individual Defendants Consented to Personal Jurisdiction in the State of New York**

A prerequisite to having the Article published in the Journal was that each of the Defendant Authors execute a "License to Publish" which expressly states that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the principles of conflicts of law. **The parties hereto submit to the non-exclusive jurisdiction of the courts of New York**." A-182 (emphasis added). As stated by this clear and unequivocal language, in agreeing to consent to the publication of the Article, the Defendant Authors also agreed to consent to personal jurisdiction in New York.

In its Decision and Order, the District Court found that personal jurisdiction did not exist based upon the License to Publish, since that document "refers only to 'non-exclusive jurisdiction' of New York courts and contains no express consent to personal jurisdiction." A-249. However, in so holding, the District Court confused exclusive jurisdiction and express permissive (or non-exclusive) jurisdiction.

55

It is well settled that "[p]arties can consent to personal jurisdiction through forum-selection clauses in contractual agreements." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006). There are two types of forum selection clauses – mandatory and permissive. Where a forum selection clause is mandatory, the parties agree in advance that a given forum shall be the designated forum to the exclusion of all others, thereby waiving personal jurisdiction in forums that would otherwise be available to the parties. *See, e.g., Phillips v. Audio Active Limited*, 494 F.3d 378, 386 (2d Cir. 2007) (defining mandatory forum selection clause as one where "contracting parties ... agree in advance on a forum where any and all of their disputes must be brought ...."). In contrast, a permissive forum (or non-exclusive) selection clause "only confers jurisdiction in the designated forum, but does not deny plaintiff his choice of forum, if jurisdiction is otherwise appropriate." *Id.*

Here, the Defendant Authors knowingly executed the License to Publish (a fact they do not dispute) and thereby consented to non-exclusive jurisdiction in New York. Contrary to the District Court's conclusion, the lack of <u>exclusive</u> jurisdiction does mean that the individual defendants did not <u>expressly consent</u> to non-exclusive personal jurisdiction in New York.

**B.    The Individual Defendants Had Sufficient Contacts With New York Such That Personal Jurisdiction Exists Under CPLR §302(a)(1)**

Whether a federal court has personal jurisdiction over a defendant is determined by the law of the state in which the district court is located.  *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006).  Further "[i]n the absence of an evidentiary hearing on the jurisdictional allegations, or a trial on the merits, all pleadings and affidavits are construed in the light most favorable to plaintiff, and where doubts exist, they are resolved in the plaintiff's favor," with the plaintiff only required to make a *prima facie* showing of jurisdiction.  *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985); *see also, Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 768 (2d Cir. 1983).

New York Civil Practice Law and Rules ("CPLR") §§301 and 302 govern personal jurisdiction in New York.  The District Court incorrectly held that it lacked personal jurisdiction over the individual defendants pursuant to CPLR §302(a)(1)[6], which affords personal jurisdiction over any party who "in person or

---

[6] ONY does not dispute that CPLR §§302(a)(2) and 302(a)(3) are inapplicable as they exclude claims for defamation, including claims for injurious falsehood and tortious interference, which New York courts, for jurisdiction purposes, treat as defamation claims.  *Cantor Fitzgerald, L.P. v. Peaselee*, 88 F.3d 152, 157 (2d Cir. 1996).  However, the District Court erred when it concluded that the "only" contact alleged by ONY was the "submission of the Article itself," thereby making jurisdiction no more appropriate under 302(a)(1) than under 302(a)(2) or (3).  A-251.  As discussed above, ONY alleges much more than that.

57

through an agent … transacts <u>any</u> business within the state or contracts <u>anywhere</u> to supply goods or services in the state" as to a cause of action arising therefrom. (Emphasis added).  "To make a prima facie showing of jurisdiction pursuant to section 302(a)(1), a plaintiff must establish, first, that defendant transacted business within the state of New York, and second, that the action arises from that transaction of business."  *The Royalty Network Inc. v. Dishant.com, LLC*, 638 F.Supp.2d 410, 417 (S.D.N.Y. 2009) (citations omitted).  For the purposes of the statute, "a party transacts business within the state when it purposefully avails itself of the privilege of conducting activities within New York."  *Id.* (citation and quotations omitted).  As stated by the United States Supreme Court, "[t]his 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts …." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations omitted). "Purposeful activities are those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (citations and quotations omitted).

Moreover, CPLR §302(a)(1), unlike CPLR §301 (which requires a consistent course of conduct to constitute "doing business"), does not require the defendant even to have ever been physically present in New York; even a single

58

remote transaction may suffice.  *Burger King,* 471 U.S. at 476 ("Jurisdiction …

may not be avoided merely because the defendant did not *physically* enter the

forum State." (emphasis in original)); *see also*, *Kreutter v. McFadden Oil Corp.*,

71 N.Y.2d 460, 467 (1988) ("[P]roof of one transaction in New York is sufficient

to invoke jurisdiction, even though the defendant never enters New York, so long

as the defendant's activities here were purposeful and there is a substantial

relationship between the transaction and the claim asserted.").  Indeed, "[s]o long

as a commercial actor's efforts are 'purposefully directed' toward residents of

another State, we have consistently rejected the notion that an absence of physical

contacts can defeat personal jurisdiction there."  *Burger King*, 471 U.S. at 476.

      1.    *Defendant Authors Have Purposefully Availed
Themselves of the Privileges of Transacting Business
in New York*

Here, ONY's claim against the Defendant Authors is premised on false

statements regarding ONY's product made in the Article which they co-authored.

A-20, ¶35. The Article was submitted to and published in the Journal by the

Defendant Authors.  The Journal, based in New York, is owned and operated by

Nature, a corporation organized and operating under the laws of the State of New

York.  A-15, ¶4.  As alleged, the Article falsely stated that the Pharmaceutical

Defendants' product has lower infant mortality than the product of ONY, a New

York corporation.  A-20, ¶37.

The Defendant Authors actively sought out, and availed themselves of, the privileges and protection of the State of New York in submitting the Article for publication in the Journal. As discussed above, the Journal conditioned publication of the Article on execution of the License to Publish, which contains an express consent to non-exclusive personal jurisdiction in New York. Having consented to jurisdiction in New York, the District Court incorrectly found that the individual defendants did not purposefully avail themselves of the privilege of conducting activities in New York in connection with the publication of the Article.

Defendants Bhatia and Sekar also hold editorial positions with the New York-based Journal (A-23, ¶¶52, 53), a fact which they failed to address in their respective declarations submitted in support of dismissal. A-118, A-122. Indeed, Defendants Bhatia and Sekar (for the first time on <u>reply</u>) described their duties as editors of the Journal, asserting that they do not have contacts with New York because they perform their editorial functions in their respective home states. In its Decision and Order, the District Court criticized Plaintiff for "offer[ing] no allegations disputing these assertions, or allegations of further New York contacts" (A-25); of course, Plaintiff **could not have** responded to issues raised for the first time in Defendants' reply papers.

The District Court's reliance on case law equating the facts of this case to those involving pure advertising was also misplaced. For example, in *Parsons v.*

60

*Kal Kan Food, Inc.*, 68 A.D.3d 1501 (3d Dept. 2009), that court <u>never</u> addressed personal jurisdiction under CPLR §302; rather, the sole analysis was under New York's general jurisdiction statute – CPLR §301.  As for the other cases cited by the District Court (*Maranga v. Vira*, 386 F.Supp.2d 299 (S.D.N.Y. 2005); *Davidson Extrusions, Inc. v. Touche Ross & Co.,* 131 A.D.2d 421 (2d Dept. 1987); and *Global Gospel Music Group LLC v. Habukkuk Music, Inc.*, 2010 WL 4968172 (S.D.N.Y. 2010)), each involved an assertion of jurisdiction based almost solely on a general advertisement in a trade journal which happened to circulate in New York, without any other acts of purposeful availment.  Such is not the case here.  Rather, the Defendant Authors expressly reached out to the Journal (a publication by a New York company in New York) for the publication of the Article.  In furtherance of the publication, each of the Defendant Authors executed the License to Publish – consenting to jurisdiction in New York.  The fact that the Defendant Authors never physically entered into New York does not negate the fact that in actively pursuing publication of the Article here they transacted business within the State for purposes of personal jurisdiction.

The facts in this case are much more analogous to those in *Calder v. Jones*, 465 U.S. 783 (1984).  In *Calder*, plaintiff, a California resident, alleged that she

had been libeled by an article written and edited by defendants in Florida.[7]  There, just as here, the Article was published in a national magazine with a large circulation in plaintiff's resident state.  Defendants asserted that they had insufficient contacts with California to be subjected to jurisdiction there.  The Supreme Court rejected that argument, stating:

> Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon [Jones].  And they knew that the brunt of that injury would be felt by [Jones] in the State in which she lives and works ….  An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.

*Id.* at 789-790.

Here, just as in *Calder*, (1) each of the Defendant Authors reside in states other than New York, (2) the subject of the Article involves ONY, a New York resident, and its product Infasurf®, (3) the Defendant Authors knew that the Article would have a "potentially devastating impact" on ONY (A-32, ¶104), and (4) the Defendant Authors knew that the "brunt of the injury" would be felt in New York (A-32, ¶105).  As in *Calder*, ONY should not have to go to California, Georgia, Oklahoma and North Carolina – the Defendant Authors' states of

---

[7] The defendants who challenged jurisdiction were individuals who worked for the National Enquirer.  *Calder*, 465 U.S. at 785-786.

residence (A-16, ¶¶8-11) − to seek redress for harm suffered in New York from a false Article knowingly submitted to and published in New York.

2.   *There Is a Substantial Connection Between the Defendant Authors' Submission of the Article and the Claims Asserted Against Them*

ONY's underlying claim of injurious falsehood against the Defendant Authors clearly arises out of the submission of the Article in New York.  As alleged, each of the Defendant Authors knowingly submitted the false Article to the Journal (A-22, ¶45), which intentionally omitted LOS data (A-21, ¶42) and citations to other known articles (A-22, ¶44) and was comprised of selective data <u>designed</u> to promote Curosurf® (A-21, ¶42), all in collusion with the Pharmaceutical Defendants (A-22, ¶46).  Moreover, Defendants Bhatia and Sekar's editorial positions with the New York-based Journal are alleged to have helped get the Article published. A-23, ¶53.  Accordingly, the connection between the Article's submission and ONY's harm is substantial.

By reason of the foregoing, the District Court erred in finding that no personal jurisdiction existed over the Defendant Authors.

63

## <u>CONCLUSION</u>

For the foregoing reasons, the District Court should be reversed, ONY's

Complaint reinstated and its Amended Complaint allowed, and the case remanded

for further proceedings.

**DATED:   Buffalo, New York**
**            September 21, 2012**

Respectfully submitted,

**JAECKLE FLEISCHMANN & MUGEL, LLP**

By:   /s/ Mitchell J. Banas, Jr.
            Mitchell J. Banas, Jr., Esq., of Counsel
*Attorneys for Plaintiff*
Avant Building, Suite 900
200 Delaware Avenue
Buffalo, New York  14202-2170
Telephone No.:  (716) 856-0600
Email:  mbanas@jaeckle.com

64

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B). This brief contains 13,668 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word v. 2003 in 14-pt. Times New Roman.

**DATED: Buffalo, New York**
**September 21, 2012**

Respectfully submitted,

**JAECKLE FLEISCHMANN & MUGEL, LLP**

By: _/s/ Mitchell J. Banas, Jr._
        Mitchell J. Banas, Jr., Esq., of Counsel
*Attorneys for Plaintiff*
Avant Building, Suite 900
200 Delaware Avenue
Buffalo, New York 14202-2170
Telephone No.: (716) 856-0600
Email: mbanas@jaeckle.com

1064223v8

65

STATE OF NEW YORK    )
                       )       ss.:       **AFFIDAVIT OF**
COUNTY OF NEW YORK  )                    **CM/ECF SERVICE**

       I, Natasha S. Johnson, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age.

       **On September 21, 2012**

deponent served the within: **Brief for Plaintiff-Appellant**

       **upon:**

**SEE ATTACHED SERVICE LIST**

via the CM/ECF Case Filing System. All counsel of record in this case are registered CM/ECF users. Filing and service were performed by direction of counsel.

**Sworn to before me on September 21, 2012**

**s/Maria Maisonet**                 **s/Natasha S. Johnson**
    **MARIA MAISONET**
  Notary Public State of New York
     No. 01MA6204360
    Qualified in Bronx County
Commission Expires Apr. 20, 2013      **Job # 243567**

**SERVICE LIST:**

**Morgan, Lewis & Bockius LLP**
*Attorneys for Defendants-Appellees Cornerstone*
*Therapeutics, Inc., Chiesi Farmaceutici S.p.A.,*
*Rangasamy Ramanathan, M.D., Jatinder J Bhatia, M.D. and*
*Krishnamurthy C. Sekar, M.D.*
**1111 Pennsylvania Avenue, NW**
**Washington, DC  20004**
**(202) 739-3000**

**Davis Wright Tremaine LLP**
**1633 Broadway, 27th floor**
**New York, New York  10019**
**(212) 489-8230**

         -and-

**Webster Szanyi LLP**
**1400 Liberty building**
**Buffalo, New York  14202**
**(716) 842-2800**

*Attorneys for Defendants-Appellees Nature Americas Inc. d/b/a*
*Nature Publishing Group and Edward E. Lawson, M.D.*

**Schiff Hardin LLP**
*Attorneys for Defendant-Appellee American Academy of Pediatrics*
**233 South Wacker Drive, Suite 6600**
**Chicago, Illinois  60606**
**(312) 258-5500**

**McDermott Will & Emery LLP**
*Attorneys for Defendants-Appellees Premier, Inc. d/b/a Premier*
*Research Services and Frank R. Ernst, Pharm. D.*
**340 Madison Avenue**
**New York, New York  10173**
**(212) 547-5400**